UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SOUTH GREEN PORTFOLIO LLC | |
| PLAINTIFF | CIVIL ACTION NO.: |
| V. | |
| AARON PURETZ | |
| DEFENDANT | JULY 6, 2023 |

## COMPLAINT

Plaintiff South Green Portfolio LLC complains and says:

## FIRST COUNT-BREACH OF GUARANTY

1.   Plaintiff South Green Portfolio LLC ("South Green") is a Connecticut limited liability company whose office is located at 91 South Main Street, Wallingford, Connecticut.

2.   Plaintiff South Green's members are Kyle O'Hehir and Joseph Motta, both of whom are domiciled in the State of Connecticut.

3.   Defendant Aaron Puretz is domiciled at 43 Fenway Circle, Staten Island, New York.

4.   This court has jurisdiction under 28 USC §1332 because this matter is between citizens of different states and exceeds $75,000, exclusive of interest and costs.

5.    On or about August 2, 2021, JM TIC, LLC and Ritz Grande CT, LLC issued a $9,840,000 note to ICE Lender Holdings, LLC ("Note").

6.    A true and correct copy of the Note is attached as Exhibit 1.

7.    Pursuant to the allonge attached to the Note, Plaintiff South Green is the owner and holder of the Note.

8.    Defendant Aaron Puretz guaranteed the Note.

9.    A true and correct copy of the guaranty of the Note is attached as Exhibit 2 ("Guaranty").

10.   The Note is secured by a mortgage ("Mortgage") on a variety of Hartford properties (collectively "Premises").

11.   Upon information and belief, Premises are worth $12,600,000 (see August 11, 2021 appraisal transmittal letter attached as Exhibit 3).

12.   JM TIC, LLC, Ritz Grande CT, LLC and ICE Lender Holdings, LLC executed a forbearance agreement attached as Exhibit 4.

13.   The Note is in default pursuant to the terms of the forbearance agreement and Defendant Aaron Puretz has not paid his Guaranty.

14.  After taking into account the values of the
Premises, Plaintiff South Green Portfolio, LLC is owed the
following amounts:

| Payoff Calculation | |
|---|---|
| Loan | South Green Portfolio |
| Origination Date | 8/2/2021 |
| Initial Principal Balance | $9,840,000 |
| Unpaid Principal Balance | $9,840,000 |
| Default Rate | 23.00% |
| Per Diem Default from 7/1/22 | $6,287 |
| | |
| Balloon Payment | $9,840,000 |
| Default Date | 7/1/2022 |
| Late Fee on Balloon Payment | $492,000 |
| Accrued Default Interest | $2,294,633 |
| | |
| Delinquent MDC Paid | $141,902.28 |
| Delinquent MDC Paid Date | 6/29/2023 |
| Late Fee on MDC | 7,095 |
| Accrued Default Interest | 181 |
| | |
| Delinquent Taxes Paid | $281,514.08 |
| Delinquent Taxes Paid Date | 6/30/2023 |
| Late Fee on Taxes | $14,076 |
| Accrued Default Interest | 180 |
| | |
| Total Payoff | $13,071,582 |
| | |
| Appraised Value | $12,600,000 |
| Deficiency | $471,582 |

G:\2433 Constitution Credit LLC\007 South Green Prtfolio v. Paxe Sisson CT Lmtd Partnership loan\Feferal-South Green Guranty action\South Green v. Gurantor 2023-07-05.doc

15.  Plaintiff South Green Portfolio LLC has been damaged by Defendant Aaron Puretz actions.


Plaintiff South Green Portfolio LLC prays for:

1.   Compensatory damages;

2.   Attorneys fees pursuant to Guaranty §19 and forbearance agreement §11;

3.   Interest against before and after judgment;

4.   Costs; and

5.   Such other and further relief as the court deems just and equitable.


_____
Houston Putnam Lowry, Esq.
Counsel for Plaintiff South Green
Portfolio LLC
FORD & PAULEKAS, LLP
280 Trumbull Street - Suite 2200
Hartford, CT 06103
Direct: (860) 808-4213
Mobile: (860) 543-4372
Fax: (860) 249-7500
Email: PTL@HPLowry.com
Federal Bar # CT05955

# EXHIBIT 1

**SECURED NOTE**

THIS IS A BALLOON MORTGAGE NOTE AND THE FINAL PAYMENT OR THE BALANCE DUE UPON MATURITY IS $9,840,000.00, LESS ANY RESERVES HELD BY LENDER, TOGETHER WITH ACCRUED INTEREST, IF ANY, AND ALL ADVANCEMENTS MADE BY THE MORTGAGEE UNDER THE TERMS OF THE MORTGAGE OR ANY OTHER UNPAID AMOUNTS

**$9,840,000.00**                                              **Date: August 2, 2021**

**Property Address:**   *(See Attached Schedule of Properties)*

     FOR VALUE RECEIVED, the undersigned, **JM TIC LLC**, a New Jersey limited liability company, whose address is 122 High Street, Passaic, New Jersey 07055 and **Ritz Grande CT LLC**, a Connecticut limited liability company, whose address is 139 Ocean Avenue, Lakewood, New Jersey 08701 (collectively and jointly and severally, "Borrower"), hereby promises to pay to **ICE Lender Holdings LLC**, or order ("Lender"), whose address is 31 West 34th Street, Suite 1012, New York, New York 10001, the principal sum of Nine Million Eight Hundred Forty Thousand ($9,840,000.00) Dollars, together with interest on the full principal balance of this Note, as follows:

1.     **Interest.**  Interest on the full principal balance, including any Lender Retained Funds, will accrue from the first date that any proceeds have been distributed to or on behalf of the Borrower (the "Date of Advance"), unless otherwise provided in this Note or the Loan Agreement at an annual rate equal to six and one-half percent (6.5%).  Interest on this Note is computed on a 30/360 simple interest basis; that is, with the exception of odd days before the first full payment cycle, monthly interest is calculated by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days.  Interest for the odd days before the first full month and any partial month in which the loan is repaid in full is calculated on the basis of the actual days and a 360-day year and shall include the day of payoff. All interest payable under this Note is computed using this method.

2.     **Payment Obligations.**

    2.1     **Payments**.  Interest-only payments shall be due and payable in consecutive monthly installments on the 1st day of each month beginning on October 1, 2021.  Such payments shall continue until the entire indebtedness evidenced by this Note and all accrued and unpaid interest and fees are fully paid, with any unpaid principal and interest due and payable on September 1, 2022 (the "Maturity Date").

    Payments due under the Note shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Loan Agreement, the Note or the Security Instrument (as defined herein) is returned to Lender unpaid, Lender may require that any or all subsequent payments due under this Note, the Loan Agreement, and the Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is

drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer. Lender reserves the right, in its sole and absolute discretion, to require payment in any other manner.

2.2 **Balloon Payment.** The payment schedule contained in this loan requires that Borrower make a balloon payment of all unpaid principal, interest, fees and costs on the Maturity Date. This balloon payment is more than double the amount of the regular payments.

2.1 **Delivery of Payments.** Payments due under this Note shall be made to Lender by electronic funds transfer by automated clearing house payments ("ACH Payments"). Borrower shall at all times maintain a valid account to be used for ACH Payments and shall ensure sufficient funds in the account to cover the amount of each payment or debit entry. Borrower's failure to maintain a valid account to be used for ACH Payments or failure to deposit and/or maintain sufficient funds in the account for each debit entry, shall be a Default under this Note and the Loan Agreement. Lender reserves the right, in its sole and absolute discretion, to require payment in any other manner.

2.2 **Order of Application of Payments.** Each payment under this Note shall be credited in the following order: (a) costs, fees, charges, and advances paid or incurred by Lender or payable to Lender and interest under any provision of this Note, the Loan Agreement, or the Security Instrument, in such order as Lender, in its sole and absolute discretion, elects, (b) interest payable under the Note, and (c) principal under the Note.

2.3 **Other Terms.** This Note is subject to the following additional terms as provided for in the Loan Agreement.

3. **Late Charge.** Borrower acknowledges that default in the payment of any sum due under this Note will result in losses and additional expenses to Lender in servicing the indebtedness evidenced by this Note, handling such delinquent payments, and meeting its other financial obligations. Borrower further acknowledges that the extent of such loss and additional expenses is extremely difficult and impractical to ascertain. Borrower acknowledges and agrees that, if any payment due under this Note is not received by Lender within ten (10) days when due, a charge of 5 cents ($0.05) for each dollar ($1.00) that is not paid when due would be a reasonable estimate of expenses so incurred (the "Progressive Exit Fee"). Without prejudicing or affecting any other rights or remedies of Lender, Borrower shall pay the Progressive Exit Fee to Lender as liquidated damages to cover expenses incurred in handling such delinquent payment.

4. **Default.** On (a) Borrower's failure to pay any installment or other sum due under this Note when due and payable (whether by extension, acceleration, or otherwise) , (b) an Event of Default (as defined in the Loan Agreement), or (c) any breach of any other promise or obligation in this Note or in any other instrument now or hereafter securing the indebtedness evidenced by this Note, then, and in any such event, Lender may, at its option, declare this Note (including, without

limitation, all accrued interest) due and payable immediately regardless of the Maturity Date. Borrower expressly waives notice of the exercise of this option.

5.       **Prepayment.**  Borrower may prepay this Note in whole or in part at any time without penalty.  All prepayments of principal on this Note shall be applied to the most remote principal installment or installments then unpaid.

6.       **Interest on Default.**  If Borrower is in default under the Loan Documents, then at the sole and absolute discretion of Lender and without notice or opportunity to cure, the entire unpaid principal balance shall immediately bear an annual interest rate equal to the lesser of (a) Twenty-Three Percent (23%) or (b) the maximum interest rate allowed by law (the "Default Rate").  If the Maturity Date is accelerated, the unpaid principal shall accrue interest at the Default Rate only until the default is cured and the Security Instrument is reinstated.  Borrower acknowledges and agrees that it would be extremely difficult or impractical to fix the actual damages resulting from Borrower's failure to pay the principal, accrued interest and other sums due on the Maturity Date, and therefore Borrower shall pay interest at the Default Rate not as a penalty, but for purposes of defraying the expenses incident to handling the past due principal, accrued interest and other sums due under this Note.  Interest at the Default Rate represents the reasonable estimate of the loss that may be sustained by Lender due to the failure of Borrower to pay the principal, accrued interest and other sums due on the Maturity Date.  Interest at the Default Rate shall be payable by Borrower without prejudice to the rights of Lender to collect any other amounts to be paid under this Note (including, without limitation, late charges), the Loan Agreement, or the Security Instrument.

7.       **Interest on Interest.**  If any interest payment under this Note is not paid when due, the unpaid interest shall be added to the principal of this Note, shall become and be treated as principal, and shall thereafter bear like interest.

8.       **Due-on-Sale.**  If Borrower sells, gives an option to purchase, exchanges, assigns, conveys, encumbers (including, but not limited to PACE/HERO loans, any loans where payments are collected through property tax assessments, and super-voluntary liens which are deemed to have priority over the lien of the Security Instrument) (other than with a Permitted Encumbrance as defined in the Security Instrument), transfers possession, or alienates all or any portion of the Property, or any of Borrower's interest in the Property, or suffers its title to, or any interest in, the Property to be divested, whether voluntarily or involuntarily; or if there is a sale or transfer of any interests in Borrower; or if Borrower changes or permits to be changed the character or use of the Property, or drills or extracts or enters into any lease for the drilling or extracting of oil, gas, or other hydrocarbon substances or any mineral of any kind or character on the Property; or if title to such Property becomes subject to any lien or charge, voluntary or involuntary, contractual or statutory, without Lender's prior written consent, then Lender, at Lender's option, may, without prior notice, declare all sums secured by the Security Instrument, regardless of their stated due date(s), immediately due and payable and may exercise all rights and remedies in the Loan Documents.

9.       **Waiver.**  Borrower, endorsers, and all other persons liable or to become liable on this Note waive diligence, presentment, protest and demand, and also notice of protest, demand, nonpayment, dishonor and maturity and consents to any extension of the time or terms of payment hereof, any and all renewals or extensions of the terms hereof, any release of all or any part of the

security given for this Note, any acceptance of additional security of any kind and any release of any party liable under this Note. Any such renewals or extensions may be made without notice to Borrower.

10.     **Notice.** Any notice required to be provided in this Note shall be given in accordance with the notice requirements provided in the Loan Agreement.

11.     **Assignment.** This Note inures to and binds the heirs, legal representatives, successors, and assigns of Borrower and Lender; provided, however, that Borrower may not assign this Note or any proceeds of it or assign or delegate any of its rights or obligations, without Lender's prior written consent in each instance. Lender in its sole discretion may transfer this Note, and may sell or assign participations or other interests in all or any part of this Note, all without notice to or the consent of Borrower.

12.     **Usury.** All agreements between Borrower and Lender are expressly limited, so that in no event or contingency, whether because of the advancement of the proceeds of this Note, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to Lender for the use, forbearance, or retention of the money to be advanced under this Note exceed the highest lawful rate permissible under applicable usury laws. If, under any circumstances, fulfillment of any provision of this Note, or the Loan Documents, after timely performance of such provision is due, shall involve exceeding the limit of validity prescribed by law that a court of competent jurisdiction deems applicable, then, ipso facto, the obligations to be fulfilled shall be reduced to the limit of such validity. If, under any circumstances, Lender shall ever receive as interest an amount that exceeds the highest lawful rate, the amount that would be excessive interest shall be applied to reduce the unpaid principal balance under this Note and not to pay interest, or, if such excessive interest exceeds the unpaid principal balance under this Note, such excess shall be refunded to Borrower. This provision shall control every other provision of all agreements between Borrower and Lender.

13.     **Capitalized Terms.** Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Loan Documents (as defined in the Loan Agreement).

14.     **Loan Agreement.** This Note is also secured by and is subject to the provisions of that certain Loan and Security Agreement of even date herewith (the "Loan Agreement") between Borrower and Lender, and all Collateral referenced and incorporated in the Loan Agreement. As specifically provided in the Loan Agreement, if Borrower defaults under this Note, Lender has the right and option to foreclose against any Collateral provided under the Loan Agreement.

15.     **WAIVER OF PREJUDGMENT REMEDY, HEARING AND NOTICE. THE UNDERSIGNED ACKNOWLEDGES THAT THIS IS A "COMMERCIAL TRANSACTION" AS SUCH IS DEFINED IN CHAPTER 903a OF THE CONNECTICUT GENERAL STATUTES, AS AMENDED. THE UNDERSIGNED FURTHER ACKNOWLEDGES THAT, PURSUANT TO SUCH CHAPTER 903a, IT HAS A RIGHT**

TO NOTICE OF AND HEARING PRIOR TO THE ISSUANCE OF ANY "PREJUDGMENT REMEDY."

NOTWITHSTANDING THE FOREGOING, THE UNDERSIGNED HEREBY WAIVES ALL RIGHTS TO SUCH NOTICE, JUDICIAL HEARING OR PRIOR COURT ORDER IN CONNECTION WITH ANY SUIT ON THIS MORTGAGE, ON THE LOAN DOCUMENTS OR ON THE NOTE OR ANY EXTENSIONS OR RENEWALS OF THE NOTE.

MORE SPECIFICALLY, BORROWER AND EACH ENDORSER, GUARANTOR, INDEMNITOR, AND/OR SURETY OF THE LOAN, IF ANY, EACH ACKNOWLEDGES THAT THE LENDER'S ATTORNEY MAY, PURSUANT TO CHAPTER 903a OF THE CONNECTICUT GENERAL STATUTES, AS AMENDED, ISSUE A WRIT FOR A PREJUDGMENT REMEDY WHICH MAY RESULT IN THE ATTACHMENT, LEVY, REPLEVIN, GARNISHMENT, OR OTHER PREJUDGMENT RELIEF AGAINST BORROWER'S, ENDORSER'S, GUARANTOR'S, INDEMNITOR'S, AND/OR SURETY'S PROPERTY, AS APPLICABLE, WITHOUT PRIOR NOTICE OR A PRIOR HEARING AND WITHOUT FIRST SECURING A COURT ORDER.

BORROWER AND EACH ENDORSER, GUARANTOR, INDEMNITOR, AND/OR SURETY OF THE LOAN, IF ANY, EACH ALSO WAIVES ANY AND ALL OBJECTION WHICH IT/HE MIGHT OTHERWISE HAVE LENDER RIGHT TO ASSERT, NOW OR IN THE FUTURE, TO THE EXERCISE OR USE BY THE LENDER OF ANY RIGHT OF SETOFF, REPOSSESSION OR SELF-HELP AS MAY PRESENTLY OR IN THE FUTURE EXIST UNDER STATUTE OR COMMON LAW.

BORROWER AND EACH ENDORSER, GUARANTOR, INDEMNITOR, AND/OR SURETY OF THE LOAN, IF ANY, EACH FURTHER CONSENT TO THE ISSUANCE OF ANY PREJUDGMENT REMEDIES WITHOUT A BOND OR OTHER SURETY OF ANY NATURE, AND EACH WAIVES ALL RIGHTS TO REQUEST OR FILE MOTIONS SEEKING TO REQUIRE THAT THE LENDER POST A BOND OR SURETY UNDER PUBLIC ACT 93-431 OR OTHERWISE IN CONNECTION WITH THE LENDER'S EXERCISE OF ANY REMEDY.

BORROWER AND EACH ENDORSER, GUARANTOR, INDEMNITOR, AND/OR SURETY OF THE LOAN, IF ANY, EACH FURTHER ACKNOWLEDGES THAT NO REPRESENTATIVE OF THE LENDER HAS AGREED WITH OR REPRESENTED TO BORROWER OR ENDORSER, GUARANTOR AND/OR SURETY OF THE LOAN, IF ANY, THAT THE WAIVERS SET FORTH IN THIS INSTRUMENT WILL NOT BE FULLY AND PROMPTLY ENFORCED IN ALL INSTANCES.

THIS AGREEMENT MAY BE EXECUTED IN COUNTER-PARTS.

[SIGNATURES FOLLOW]

IN WITNESS WHEREOF, Maker has duly executed this Secured Note as of the day and year first above written.

BORROWER:

**JM TIC LLC**, a New Jersey limited liability company

_____

By: Aron Puretz, Manager

**RITZ GRANDE CT LLC**, a Connecticut limited liability company
By: Ritz Grande CT Manager LLC, a New Jersey limited liability company, its Managing Member

_____

By: Aron Puretz, Member

STATE OF NEW YORK      )
                                            ) ss:
COUNTY OF KINGS          )

On the _2_ day of August in the year 2021 before me, the undersigned, a Notary Public in and for said State, personally appeared **Aron Puretz** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

SANDRA KENIGSBERG
NOTARY PUBLIC-STATE OF NEW YORK
No. 01KE6018956
Qualified in Kings County
My Commission Expires February 01, 20 23

## SCHEDULE OF PROPERTIES

**PARCEL ONE (30-54 ALDEN STREET)**
Those certain 19 property units situated in the City of Hartford, County of Hartford and State of
Connecticut known as Unit Nos. 30A-102, 30A-202, 32A-101, 32A-201, 40A-103, 40A-203, 40A-303,
42A-102, 42A-202, 42A-302, 44A-101, 44A-201, 44A-301, 52A-102, 52A-202, 52A-302, 54A-101,
54A-201 and 54A-301 located in Aria Alden Condominiums together with an undivided interest in the
Common Elements and Limited Common Elements. Said Units being more particularly described in the
Declaration of Aria Alden Condominiums by Aria Congress LLC dated June 18, 2018 and recorded on
June 28, 2018 in Volume 7356 at Page 1 of the Hartford Land Records (the "Declaration"), as amended
by documents recorded in Volume 7573 at Page 265 and at Page 268 of the Hartford Land Records, and
as may be further amended.
Together with all development rights, declarant rights and special declarant rights relative to said Units.

**PARCEL TWO (38-60 CONGRESS STREET & 22-30 MORRIS STREET)**
Those certain 46 property units situated in the City of Hartford, County of Hartford and State of
Connecticut known as Unit Nos. 22M-102, 22M-202, 22M-302, 24M-101, 24M-201, 24M-301, 30M-
101, 30M-102, 30M-201, 30M-202, 30M-301, 30M-302, 38C-101, 38C-102, 38C-201, 38C-202, 38C-
301, 38C-302, 42C-101, 42C-201, 42C-301, 44C-102, 44C-202, 44C-302, 46C-101, 46C-201, 46C-301,
48C-102, 48C-202, 48C-302, 50C-201, 50C-202, 50C-301, 50C-302, 52C-102, 54C-101, 56C-201, 56C-
202, 56C-301, 56C-302, 58C-101, 58C-201, 58C-301, 60C-102, 60C-202 and 60C-302 located in Aria
Congress Condominiums together with an undivided interest each for an aggregate of 100% in the
Common Elements and Limited Common Elements, said Units being more particularly described in the
Declaration of Aria Congress Condominiums by Aria Congress LLC dated June 18, 2018 and recorded on
June 28, 2018 in Volume 7356 at Page 82 of the Hartford Land Records.
Together with all development rights, declarant rights and special declarant rights held by Aria Congress
LLC.

**PARCEL THREE (405-407 WETHERSFIELD AVENUE)**
A certain piece or parcel of land, together with the buildings thereon, situated in the Town and County of
Hartford and State of Connecticut, being known as Nos. 405-407 Wethersfield Avenue, and being
bounded and described as follows, to wit;
NORTHERLY by Bond Street, a distance of 150.28 feet;
EASTERLY by Wethersfield Avenue, a distance of 65 feet;
SOUTHERLY by land now or formerly of Ralph A. Sheheen et al, a distance of 150 feet; and
WESTERLY by land now or formerly of Edmundo Platania et al, a distance of 55.80 feet.

**PARCEL FOUR (409-411 WETHERSFIELD AVENUE)**
A certain piece or parcel of land, together with the buildings and improvements thereon, situated in the
City of Hartford, County of Hartford and State of Connecticut, being known as No. 409-411 Wethersfield
Avenue, and being more particularly bounded and described as follows:
NORTHERLY: By land now or formerly of Salvatore Carrabino, a distance of about 150 feet;
EASTERLY: By Wethersfield Avenue, a distance of about 38 feet;
SOUTHERLY: By land now or formerly of Samuel S. Schwartz, et al, a distance of about 150 feet; and
WESTERLY: By land now or formerly of Frank M. Manacchio, a distance of about 38 feet, more or less.
The northeast corner of said piece or parcel of land is about 65 feet south of the intersection of the
westerly line of Wethersfield Avenue and the southerly line of Bond Street.
Said premises are conveyed together with a 12-foot wide right of way for ingress and egress, by foot and
vehicle across the parking lot of 405-407 Wethersfield Avenue to Bond Street for the benefit of this
parcel.
**PARCEL FIVE (415 WETHERSFIELD AVENUE – UNITS 1, 2, 3, 4 and 5)**

Those certain Units, with the appurtenances thereto, located in the City of Hartford, County of Hartford and State of Connecticut known as Unit Nos. 1, 2, 3, 4 and 5 of Barker House Condominium, together with its interest in the Common Elements appurtenant thereto, said Units and Common Elements being more specifically designated and described in the Declaration entitled, "Declaration of Barker House Condominium" by Ralph A. Sheheen and Ellen F. Sheheen, dated December 23, 1982, and recorded in Volume 2026 at Page 44 of the Hartford Land Records, and the survey and floor plans of Barker House Condominium filed in the Hartford Land Records simultaneously therewith.

**PARCEL SIX (468-470 WETHERSFIELD AVENUE)**
A certain piece or parcel of land, with the buildings and improvements thereon, situated in the Town of Hartford, County of Hartford and State of Connecticut, on the east side of Wethersfield Avenue, known as Nos. 468-470 Wethersfield Avenue, and more particularly bounded and described as follows:
NORTH: by lands now or formerly of Calvin Meyer, Edward J. Poulin and Helen E. Poulin, partly by each;
EAST: by lands now or formerly of John Novosel and Frank Evanusch, partly by each;
SOUTH: by land now or formerly of Maria Paskov; and
WEST: by Wethersfield Avenue.
Being about Seventy-Four (74) feet front and rear and about Two Hundred (200) feet deep.

**PARCEL SEVEN (474 WETHERSFIELD AVENUE)**
A certain piece or parcel of land together with all buildings thereon, situated in the Town of Hartford, County of Hartford and State of Connecticut, known as No. 474 Wethersfield Avenue and more particularly bounded and described as follows, to wit:
NORTHERLY: by land now or formerly of Dominick Stavola and Domenico Ronzo, Two Hundred (200) feet;
EASTERLY: by land now or formerly of Frank Evanusch, Thirty-Three (33) feet;
SOUTHERLY: by land now or formerly of The Second Church of Christ in Hartford. Two Hundred (200) feet; and
WESTERLY: by Wethersfield Avenue, Thirty-Three (33) feet.
The south line of said premises runs through the center or a partition wall of the double dwelling house. the north half of which stands on the premises herein described.
The east line of said premises is a straight line running from a point in the north boundary line of premises of the Second Church of Christ of Hartford, which point is Two Hundred (200) feet from the east street line of Wethersfield Avenue, to the southeast corner of premises now or formerly of Dominick Stavola and Domenico Ronzo.

**PARCEL EIGHT (476 WETHERSFIELD AVENUE)**
A certain piece or parcel of land, with the building and improvements thereon, situated in the Town of Hartford, County of Hartford and State of Connecticut known as 476 Wethersfield Avenue and being more particularly bounded and described as follows:
NORTHERLY: by land now or formerly of Maria Paskov and Stephen F. Ivanusic, partly by each, in all, Two Hundred Fifty (250) feet;
EASTERLY: by land now or formerly of American Linen Supply Company, Thirty-Three (33) feet;
SOUTHERLY: by land now or formerly of Minerva A.W. Smith, about Two Hundred Fifty (250) feet; and
WESTERLY: by Wethersfield Avenue, Thirty-Three (33) feet.

**PARCEL NINE (29-31 ANNAWAN STREET)**

Those certain 58 property units situated in the City of Hartford, County of Hartford and State of Connecticut known as Unit Nos. A2, A4, A6, Bl, B2, B3, B4, B5, B6, Cl, C2, C3, C4, C5, C6, D1, D2, D3, D4, D5, D6, El, E2, E3, E4, E5, E6, F1, F2, F3, F4, F5, F6, F7, G1, G2, G3, G4, G5, G6, H1, H2, H3, H4, H5, H6, I1,I2, I3, I4, I5, 16, J1, J2, J3, J4, J5 and J6 located in Aria Annawan Condominiums together with an undivided interest each for an aggregate of 100% in the Common Elements and Limited Common Elements. Said Units being more particularly described in the Declaration of Aria Annawan Condominiums by 29 Annawan Street LLC dated June 18, 2018 and recorded on June 28, 2018 in Volume 7355 at Page 201 of the Hartford Land Records (the "Declaration").

**ALLONGE**

ENDORSEMENT to that certain Secured Note dated as of August 2, 2021, by and from JM TIC LLC and RITZ GRANDE CT LLC in favor of ICE LENDER HOLDINGS LLC, in the original principal sum of $9,840,000.00.

Pay to the order of **SOUTH GREEN PORTFOLIO LLC**, a Connecticut limited liability company ("*Assignee*"), without recourse, representation or warranty, express or implied.

DATE:  As of June 21, 2023

---

       **ICECAP REAL ESTATE LOAN FUND I, LLC,**
       a New York limited liability company

       By: _____
         Name: Jack Oved
         Title: VP


**THIS NOTE ALLONGE SHOULD BE PERMANENTLY AFFIXED**
**TO THE PROMISSORY NOTE DESCRIBED ABOVE**

# EXHIBIT 2

## GUARANTY

**THIS GUARANTY** ("Guaranty") is entered into and effective as of August 2, 2021, and is by and among **ARON PURETZ**, whose address for purposes of this Guaranty is 43 Fenway Circle, Staten Island, New York 10308 ("Guarantor"); and **ICE LENDER HOLDINGS LLC** ("Lender"), whose address for purposes of this Guaranty is 31 West 34th Street, Suite 1012, New York, New York 10001, and is delivered to and in favor of Lender, its successors and assigns.

To induce Lender to make the Loan to **JM TIC LLC**, a New Jersey limited liability company, whose address is 122 High Street, Passaic, New Jersey 07055 and **Ritz Grande CT LLC**, a Connecticut limited liability company, whose address is 139 Ocean Avenue, Lakewood, New Jersey 08701 (collectively, jointly and severally, "Borrower"), which Guarantor acknowledges that Lender would not do without this Guaranty, and for other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor agrees as follows:

1.    **Guaranty.**

1.1    **Guaranty of Obligations.**  Guarantor guarantees to Lender, its successors, and assigns the full and faithful payment of all amounts owed and performance of each and every one of the obligations, responsibilities, and undertakings to be carried out, performed, or observed by Borrower under the Loan Agreement, the Note, the Security Agreement, any other agreement that now or later secures repayment of the Note, any other agreement that Guarantor now or later states is guaranteed, and any other agreement that Guarantor or Borrower signs in connection with the loan obtained by Borrower.  All these documents are collectively referred to as the "Loan Documents," which Loan Documents evidence the "Loan." The obligations guaranteed are referred to as the "Guaranteed Obligations."

1.2    **Guaranty of Borrower's Performance.**  If at any time Borrower, or its successors or permitted assigns, fails, neglects or refuses to pay when due amounts or perform when due any of its obligations, responsibilities, or undertakings as expressly provided under the terms and conditions of the Loan Documents, Guarantor shall pay such amounts or perform or cause to be performed such obligations, responsibilities, or undertakings as required under the terms and conditions of the Loan Documents.

1.3    **Guaranty of Completion of Construction on the Property.**  Guarantor shall, jointly and severally, unconditionally guarantee that all buildings, site improvements, tenant finish-work, and all other Improvements will be fully completed to Lender's satisfaction in accordance with the final Plans approved by Lender; that such Improvements will be free of all liens, including mechanics' and materialmen's liens; that funds will be made available for such completion; that completion will occur before the Maturity Date (as defined in the Loan Agreement); and that the completed Improvements (as defined in the Security Instrument) will comply with all ordinances, building codes, zoning requirements, and environmental laws and regulations.

2.    **Absolute.**  This Guaranty is irrevocable, absolute, present, and unconditional.  The obligations of Guarantor under this Guaranty shall not be affected, reduced, modified, or impaired

Guaranty

on the happening from time to time of any of the following events, whether or not with notice to (except as notice is otherwise expressly required) or the consent of Guarantor:

      2.1    **Failure to Give Notice.**  The failure to give notice to Guarantor of the occurrence of a default under the terms and provisions of this Guaranty or the Loan Documents;

      2.2    **Modifications or Amendments.**  The modification or amendment, whether material or otherwise, of any obligation, covenant, or agreement set forth in this Guaranty or Loan Documents;

      2.3    **Lender's Failure to Exercise Rights.**  Any failure, omission, delay by, or inability by Lender to assert or exercise any right, power, or remedy conferred on Lender in this Guaranty or the Loan Documents, including the failure to execute on collateral held for this Guaranty or the Loan Documents;

      2.4    **Release of Security.**  Any release of any real or personal property or other security now held or to be held by Lender for the performance of the Guaranteed Obligations;

      2.5    **Borrower's Termination.**  A termination, dissolution, consolidation, or merger of Borrower with or into any other entity;

      2.6    **Borrower's Bankruptcy.**  The voluntary or involuntary liquidation, dissolution, sale, or other disposition of all or substantially all of Borrower's assets, the marshalling of Borrower's assets and liabilities, the receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors, or readjustment of, or other similar proceedings affecting Borrower, Guarantor or any of the assets of either Borrower or Guarantor;

      2.7    **Lender's Assignment of Rights.**  The assignment of any right, title, or interest of Lender in this Guaranty or the Loan Documents to any other person; or

      2.8    **Extent of Guarantor's Obligations.**  Any other cause or circumstance, foreseen or unforeseen, whether similar or dissimilar to any of the foregoing; it being the intent of Guarantor that its obligations under this Guaranty shall not be discharged, reduced, limited, or modified except by (a) payment of amounts owing pursuant to this Guaranty and/or Loan Documents (and then only to the extent of such payment or payments); and (b) full performance of obligations under this Guaranty and/or Loan Documents (and then only to the extent of such performed or discharged obligation or obligations).

      2.9    **Exercise of Lender Rights.**  Any action of Lender authorized herein.

3.    **Additional Credit.**  Additional credit under the Loan Documents may be granted from time to time at Borrower's request and without further authorization from or notice to Guarantor and shall automatically be deemed part of the Guaranteed Obligations.  Lender need not inquire into Borrower's power or the authority of its members, officers, or agents acting or purporting to act on its behalf.  Each credit granted to Borrower under the Loan Documents shall be deemed to

have been granted at Guarantor's insistence and request and in consideration of, and in reliance on, this Guaranty.

4.   **Guaranty of Payment.**   Subject to the limitations provided herein, Guarantor's liability on this Guaranty is a guaranty of payment and performance, not of collectability.

5.   **Cessation of Liability.**   Guarantor's liability under this Guaranty shall not in any way be affected by the cessation of Borrower's liability for any reason other than full performance of all the obligations under the Loan Documents, including, without limitation, any and all obligations to indemnify Lender.

6.   **Authorization of Lender.**   Guarantor authorizes Lender, without notice or demand and without affecting its liability under this Guaranty, and without consent of Guarantor or prior notice to Guarantor, to:

   6.1   **Modify Loan Documents.**   Make any modifications to the Loan Documents;

   6.2   **Assign Guaranty.**   Assign the Loan Documents and this Guaranty;

   6.3   **Modify Security.**   Take, hold, or release security for the performance of the Guaranteed Obligations with the consent of the party providing such security;

   6.4   **Additional Guarantors.**   Accept or discharge, in whole or in part, additional guarantors;

   6.5   **Order of Sale.**   Direct the order and manner of any sale of all or any part of security now or later held under the Loan Documents or this Guaranty, and also bid at any such sale to the extent allowed by law; and

   6.6   **Application of Proceeds.**   Apply any payments or recovery from Borrower, Guarantor, or any source, and any proceeds of any security, to Borrower's obligations under the Loan Documents in such manner, order, and priority as Lender may elect, whether or not those obligations are guaranteed by this Guaranty or secured at the time of such application.

7.   **Lender's Rights on Borrower's Default.**   Guarantor agrees that on Borrower's default Lender may elect to nonjudicially or judicially foreclose against all or part of the real or personal property securing Borrower's obligations, or accept an assignment of any such security in lieu of foreclosure, or compromise or adjust any part of such obligations, or make any other accommodation with Borrower or Guarantor, or exercise any other remedy against Borrower or any security. No such action by Lender shall release or limit Guarantor's liability to Lender, even if the effect of that action is to deprive Guarantor of the right to collect reimbursement from Borrower or any other person for any sums paid to Lender or bar or prejudice Guarantor's rights of subrogation, contribution, or indemnity against Borrower or any other person. Without limiting the foregoing, it is understood and agreed that, on any foreclosure or assignment in lieu of foreclosure of any security held by Lender, such security shall no longer exist and that any right that Guarantor might otherwise have, on full payment of the Borrower's obligations by Guarantor to Lender, to participate in any such security or to be subrogated to any rights of Lender with respect to any such security shall be nonexistent; nor shall Guarantor be deemed to have any right,

Guaranty

title, interest, or claim under any circumstances in or to any real or personal property held by Lender or any third party following any foreclosure or assignment in lieu of foreclosure of any such security. Guarantor again specifically acknowledges and waives the above as more specifically provided for herein.

8.    **Effect of Borrower's Bankruptcy.** The liability of Guarantor under this Guaranty shall in no way be affected by:

    8.1    **Release of Borrower.** Release or discharge of Borrower in any creditor proceeding, receivership, bankruptcy, or other release or discharge of Borrower, for any reason;

    8.2    **Modification of Borrower's Liability.** Impairment, limitation, or modification of Borrower's liability or the estate, or of any remedy for the enforcement of Borrower's liability, which may result from the operation of any present or future provision of the Bankruptcy Code (Title 11 of the United States Code, as amended; 11 U.S.C. §§ 101-1330) or any bankruptcy, insolvency, state or federal debtor relief statute, any other statute, or from the decision of any court;

    8.3    **Rejection of Debt.** Rejection or disaffirmance of the Indebtedness, or any portion of the Indebtedness, in any such proceeding;

    8.4    **Cessation of Borrower's Liability.** Cessation, from any cause whatsoever, whether consensual or by operation of law, of Borrower's liability to Lender resulting from any such proceeding; or

    8.5    **Modification and Replacement of Guaranteed Obligation.** If the Guaranteed Obligations are restructured or replaced in connection with a bankruptcy proceeding or case, Guarantor shall remain liable as guarantor of such restructured or replaced obligation.

9.    **Subordination.** Until the Guaranteed Obligations have been paid or otherwise discharged in full, Guarantor subordinates any and all liability or indebtedness of Borrower owed to Guarantor to the obligations of Borrower to Lender that arise under the Guaranteed Obligations. However, Guarantor may receive payment of current reasonable salary and current reasonable payments made in the ordinary course of business for goods provided or services rendered.

10.    **Application of Payments.** With or without notice to Guarantor, Lender, in its sole and absolute discretion may:

    10.1    **Priority of Payments.** Apply any or all payments or recoveries from Borrower, from Guarantor, or from any other guarantor or endorser under this or any other instrument, or realized from any security, in such manner, order, or priority as Lender sees fit, to the indebtedness of Borrower to Lender under the Loan Documents, whether such indebtedness is guaranteed by this Guaranty or is otherwise secured or is due at the time of such application; and

    10.2    **Refund to Borrower.** Refund to Borrower any payment received by Lender on any indebtedness guaranteed in this Guaranty, and payment of the amount refunded is fully guaranteed. Any recovery realized from any other guarantor under this or any other instrument shall be first credited on that portion of the indebtedness of Borrower to Lender that exceeds the maximum liability, if any, of Guarantor under this Guaranty.

11.    **Claims in Bankruptcy.**  Guarantor shall file all claims against Borrower in any bankruptcy or other proceeding in which the filing of claims is required or allowed by law on any indebtedness of Borrower to Guarantor, and shall assign to Lender all rights of Guarantor on any such indebtedness.  If Guarantor does not file any such claim, Lender, as attorney-in-fact for Guarantor, is authorized to do so in Guarantor's name, or, in Lender's discretion, to assign the claim and to file a proof of claim in the name of Lender's nominee.  In all such cases, whether in bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Lender the full amount of any such claim, and, to the full extent necessary for that purpose, Guarantor assigns to Lender all of Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled.

12.    **Representations and Warranties if Guarantor is an Entity.**  If Guarantor is an entity, Guarantor represents and warrants to Lender that:

12.1    **Legal Status.**  Guarantor (a) is duly organized, validly existing under, and in good standing with, the laws of the state in which it is domiciled and in the state in which the property secured the Loan is located in; (b) has all requisite power, and has all material governmental licenses, authorizations, consents, and approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted; and (c) is qualified to do business in the state in which any property securing the loan is located in.

12.2    **No Breach.**  Neither the execution and delivery of this Guaranty nor compliance with its terms and provisions shall conflict with or result in a breach of, or require any consent under, the organizational documents of Guarantor, or any agreement or instrument by which Guarantor is bound.

12.3    **Authority and Power.**  Guarantor has all necessary power and authority to execute, deliver, and perform its obligations under this Guaranty.  Guarantor's execution, delivery, and performance of this Guaranty has been duly authorized by all necessary action on its part; and this Guaranty has been duly and validly executed and delivered by Guarantor and constitutes its legal, valid, and binding obligation, enforceable against Guarantor in accordance with its terms. Guarantor shall, concurrently with the execution of this Guaranty, deliver to Lender a copy of a resolution of Guarantor's managing member(s), if a limited liability company, or board of directors and/or shareholders, if a corporation, authorizing or ratifying execution of this Guaranty.

13.    **Representations and Warranties if Guarantor is an Individual.**  If Guarantor is an individual, Guarantor represents and warrants to Lender that:

13.1    **Legal Status.**  Guarantor has all requisite power and has all material governmental licenses, authorizations, consents, and approvals necessary to carry on his business as now being or as proposed to be conducted.

13.2    **No Breach.**  Neither the execution and delivery of this Guaranty nor compliance with its terms and provisions shall conflict with or result in a breach of, or require any consent under any agreement or instrument by which Guarantor is bound.

13.3 **Authority and Power**. This Guaranty has been duly and validly executed and delivered by Guarantor and constitutes its legal, valid, and binding obligation, enforceable against Guarantor in accordance with its terms.

13.4 **Financial Statements**. All financial information furnished or to be furnished to lender is or will be true and correct, does or will fairly represent the financial condition of Guarantor, and was or will be prepared in accordance with generally accepted accounting principles ("GAAP").

13.5 **Claims and Proceedings**. There are no claims, actions, proceedings, or investigations pending against Guarantor.

14. **Information Not Required**. Guarantor represents that Guarantor is fully aware of Borrower's financial condition and operation and is in a position by virtue of his, her, or its relationship to Borrower to obtain all necessary financial and operational information concerning Borrower. Lender need not disclose to Guarantor any information about:

14.1 **Loan Documents**. The Loan Documents or any modification of them, and any action or non-action in connection with them;

14.2 **Other Guaranteed Obligations**. Any other obligation guaranteed in this Guaranty;

14.3 **Borrower's Financial Condition**. The financial condition or operation of Borrower; or

14.4 **Other Guarantors**. Any other guarantors.

15. **Notice**. Except for any notice required by Governmental Requirements to be given in another manner, (a) all notices required or permitted by this Guaranty shall be in writing; (b) each notice to Guarantor shall be sent (i) for personal delivery by a delivery service that provides a record of the date of delivery, the individual to whom delivery was made, and the address where delivery was made; (ii) by certified United States mail, postage prepaid, return receipt requested; or (iii) by nationally recognized overnight delivery service, marked for next-business-day delivery; and (c) all notices shall be addressed to the appropriate party at its address stated on Page 1 of this Guaranty or such other addresses as may be designated by notice given in compliance with this provision. Notices will be deemed effective on the earliest of (a) actual receipt; (b) rejection of delivery; or (c) if sent by certified mail, the third day on which regular United States mail delivery service is provided after the day of mailing or, if sent by overnight delivery service, on the next day on which such service makes next-business-day deliveries after the day of sending.

16. **No Waiver Upon Lender's Lack of Enforcement**. No failure or delay by Lender, or its successors and assigns, in exercising any right, power, or privilege under this Guaranty shall operate as a waiver; nor shall any single or partial exercise of any right, power, or privilege preclude any other or further such exercise or the exercise of any other right, power, or privilege.

17. **Governing Law; Consent to Jurisdiction and Venue**. This Guaranty is made by Lender and accepted by Guarantor in the State of New York except that at all times the provisions for the

Guaranty

creation, perfection, priority, enforcement and foreclosure of the liens and security interests created in the Real Property Collateral under the Loan Documents shall be governed by and construed according to the laws of the state in which each Real Property Collateral is situated. To the fullest extent permitted by the law of the state in which each Real Property Collateral is situated, the law of the State of New York shall govern the validity and enforceability of all Loan Documents, and the debt or obligations arising hereunder (but the foregoing shall not be construed to limit Lender's rights with respect to such security interest created in the state in which each Real Property Collateral is situated). The parties agree that jurisdiction and venue for any dispute, claim or controversy arising, other than with respect to perfection and enforcement of Lender's rights against the Real Property Collateral, shall be New York, New York, or the applicable federal district court that covers said County, and Guarantor submits to personal jurisdiction in that forum for any and all purposes. Guarantor waives any right Guarantor may have to assert the doctrine of forum non conveniens or to object to such venue.

GUARANTOR'S INITIALS: _____

18.    **Advice of Counsel.** Guarantor expressly declares that it knows and understands the contents of this Guaranty and has either consulted or had the opportunity to consult with an attorney as to its form and content.

19.    **Attorney Fees.** Whether or not legal action is commenced, dismissed, or pursued to judgment, the prevailing party shall be entitled to payment of all fees and costs (including, without limitation, attorney fees and costs) that may be incurred by such party in connection with the enforcement of this Guaranty, the enforcement of any of the Loan Documents, and the protection of prevailing party's rights under this Guaranty or under the Loan Documents (whether in state, federal, or Bankruptcy Court proceedings).

In addition to the aforementioned fees, costs, and expenses, the prevailing party in any lawsuit on this Guaranty shall be entitled to its attorney fees, and all other fees, costs, and expenses incurred in any postjudgment proceedings to collect or enforce any judgment. This provision for the recovery of postjudgment fees, costs, and expenses is separate and several and shall survive the merger of this Guaranty into any judgment on this Guaranty.

20.    **Assignability.** This Guaranty shall be binding on Guarantor and Guarantor's heirs, representatives, successors and assigns and shall inure to the benefit of Lender, its successors and assigns, and their successors and assigns and respective personal representatives, successors, and assigns according to the context of this Guaranty. Guarantor shall not have the right to assign the obligations in this Guaranty. Lender may assign its rights under this Guaranty in connection with an assignment of all or part of the Guaranteed Obligation. Notice is hereby waived as to any such assignment by Lender.

21.    **Revival of Guaranty.** If a claim ("Claim") is made on Lender at any time (whether before or after payment or performance in full of any Guaranteed Obligation, and whether such claim is asserted in a bankruptcy proceeding or otherwise) for repayment or recovery of any amount or other value received by Lender (from any source) in payment of, or on account of, any Guaranteed Obligation, and if Lender repays such amount, returns value or otherwise becomes liable for all or part of such Claim by reason of (a) any judgment, decree, or order of any court or administrative body or (b) any settlement or compromise of such Claim, Guarantor shall remain severally liable

Guaranty

to Lender for the amount so repaid or returned or for which Lender is liable to the same extent as if such payments or value had never been received by Lender, despite any termination of this Guaranty or the cancellation of any note or other document evidencing any Guaranteed Obligation.

22.   **Captions.**   The captions and section headings appearing in this Guaranty are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Guaranty.

23.   **Severability.**   If any provision in this Guaranty is invalid and unenforceable in the jurisdiction whose law is applied to this Guaranty or in any particular context, then, to the fullest extent permitted by law, (a) the other provisions shall remain in full force and effect in such jurisdiction or context and shall be liberally construed in favor of Lender in order to carry out the parties' intentions as nearly as possible, and (b) the invalidity or unenforceability of any provision in that jurisdiction or context shall not affect the validity or enforceability of such provision in any other jurisdiction.

**24.   Waivers.**

24.1   **Waiver of Rights to Require Lender to Act.**   Guarantor waives the right to require Lender to:

24.1.1  Proceed against Borrower or any other person;

24.1.2  Proceed or exhaust any security held from any person;

24.1.3  Proceed against any other guarantor; or

24.1.4  Pursue any other remedy available to Lender.

24.2   **Waivers Until Obligation Is Repaid.**   Until the Guaranteed Obligations have been paid or otherwise discharged in full:

24.2.1  Guarantor waives all rights of subrogation, indemnity, any rights to collect reimbursement from Borrower, and any right to enforce any remedy that Lender now has, or may have, against Borrower.

24.2.2  Guarantor waives any benefit of, and any right to participate in, any security now or later held by Lender.

24.2.3  Guarantor waives any defense it may have now or in the future based on any election of remedies by Lender that destroys Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, and Guarantor acknowledges that it shall be liable to Lender even though Guarantor may well have no such recourse against Borrower.

24.2.4  Guarantor waives notice of (a) acceptance and reliance on this Guaranty; (b) notice of renewal, extension, or modification of any Guaranteed Obligation under this Guaranty; and (c) notice of default or demand in the case of default.

24.2.5  Guarantor waives any right or defense it may now or hereafter have based on (a) Lender's full or partial release of any party who may be obligated to Lender; (b) Lender's full or partial release or impairment of any collateral for the Guaranteed Obligations; and (c) the modification or extension of the Guaranteed Obligations.

24.2.6  Guarantor waives any and all suretyship defenses now or later available to it under the law governing this Guaranty.

24.2.7  Without limiting the generality of any other waiver or provision of this Guaranty, Guarantor waives, to the maximum extent such waiver is permitted by law, any and all benefits or defenses arising directly or indirectly under the law governing this Guaranty.

24.2.8  Guarantor waives any statute of limitation affecting liability under this Guaranty or the enforceability of this Guaranty and further waives any defense that might otherwise exist because of the expiration of the statute of limitations on the Loan Documents.

24.2.9  Guarantor waives any duty of Lender to disclose to Guarantor any facts Lender may now know or later learn about Borrower or Borrower's financial condition regardless of whether Lender has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume, or has reason to believe that such facts are unknown to Guarantor, or has a reasonable opportunity to communicate such facts to Guarantor, it being understood and agreed that Guarantor is fully responsible for and is capable of being and keeping informed of Borrower's financial condition and of all circumstances bearing on the risk of nonpayment of any indebtedness guaranteed under this Guaranty.

24.2.10      Guarantor waives all notices to Guarantor.

25.    **Arbitration.**  Concurrently herewith, Borrower and Guarantor shall execute that certain Arbitration Agreement whereby Borrower, Guarantor, and Lender agree to arbitrate any disputes to resolve any Claims (as defined in the Arbitration Agreement).

26.    **Jurisdiction.**  The parties agree that all actions or proceedings arising in connection with this Guaranty and the other Loan Documents shall be tried and litigated only in the state courts located in the county in which notice shall be sent to Lender pursuant to this Guaranty, or the applicable federal district court that covers said county.

27.    **Joint and Several.**  If this Guaranty is issued by more than one party or if any other party guarantees the obligations of Borrower, the obligations of Guarantor and any others under this Guaranty shall be joint and several.

28.    **Entire Agreement.**  This Guaranty embodies the entire agreement and understanding between Guarantor and Lender pertaining to the subject matter of this Guaranty, and supersedes all prior agreements, understandings, negotiations, representations, and discussions, whether verbal or written, of the parties, pertaining to that subject matter.  Guarantor is not relying on any

representations, warranties, or inducements from Lender that are not expressly stated in this Guaranty.

29.    **Further Assurances.**  Guarantor shall promptly and duly execute and deliver to Lender such further documents and assurances and take such further action as Lender may from time to time reasonably request, including, without limitation, any amendments to this Guaranty to establish and protect the rights, interests, and remedies created or intended to be created in favor of Lender.

30.    **Gender; Singular Includes Plural.**  As used in this Guaranty, the singular includes the plural, and the masculine includes the feminine and neuter, and vice versa, if the context so requires.

31.    **Nonwaiver.**  No provision of this Guaranty or right of Lender under this Guaranty can be waived, nor can Guarantor be released from its obligations under this Guaranty except by a writing duly executed by an authorized representative of Lender.

32.    **Continuing Liability.**  Guarantor shall continue to be liable under this Guaranty despite the transfer by Borrower of all or any portion of the property encumbered by the Loan Documents.

33.    **Time Is of the Essence.**  Time is of the essence under this Guaranty and any amendment, modification, or revision of this Guaranty.

34.    **Cumulative Rights.**  The extent of Guarantor's liability and all rights, powers, and remedies of Lender under this Guaranty, and under any other agreement now or at any future time in force between Lender and Guarantor, shall be cumulative and not alternative, and such rights, powers, and remedies shall be in addition to all rights, powers, and remedies given to Lender by law.  This Guaranty is in addition to and exclusive of the guaranty of any other guarantor of any indebtedness of Borrower to Lender.

35.    **WAIVER OF JURY TRIAL.**  TO THE EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR, AND LENDER AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED ON OR ARISING FROM THE LOAN DOCUMENTS.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. GUARANTOR AND, BY ITS ACCEPTANCE OF THE BENEFITS OF THE LOAN, LENDER EACH (A) ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR BORROWER AND LENDER TO ENTER INTO A BUSINESS RELATIONSHIP, THAT BORROWER AND LENDER HAVE ALREADY RELIED ON THIS WAIVER BY ENTERING INTO THE LOAN OR ACCEPTING ITS BENEFITS, AS THE CASE MAY BE, AND THAT EACH SHALL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS, AND (B) FURTHER WARRANTS AND REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING

CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THE LOAN AGREEMENT OR THE NOTE.

36.   **Separation of Parties.**  Guarantor is separate and distinct from Borrower.  Borrower and Guarantor were solely responsible for all corporate structuring and Lender had no role in the corporate structuring of Borrower and/or Guarantor.  Borrower and Guarantor have provided independent financial statements to Lender and Lender has relied on such financial statements in making loan to Borrower.

37.   **Capitalized Terms.**  Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Loan Documents, each executed of even date herewith.

38.   **Community Property**.  If Guarantor (or any Guarantor, if more than one) is a married person, and the state of residence of Guarantor or Guarantor's spouse ("Guarantor Spouse") is a community property jurisdiction, then each of the following apply:

38.1   Guarantor (or each such married Guarantor, if more than one) agrees that Lender may satisfy Guarantor's obligations under this Guaranty to the extent of all Guarantor's separate property and against the marital community property of Guarantor and Guarantor Spouse.

38.2   If Guarantor Spouse is not also a Guarantor of the Loan, Guarantor certifies that none of the assets shown on his or her financial statements submitted to Lender for purposes of underwriting the Loan were either (i) Guarantor Spouse's individual property, or (ii) community property under the sole management, control, and disposition of Guarantor Spouse.

38.3   If Guarantor Spouse is not also a Guarantor of this loan and Guarantor or Guarantor Spouse's state of residence is Alaska, Arizona, Idaho, Louisiana, Nevada, New Mexico, Washington, or Wisconsin, Guarantor has caused Guarantor Spouse to acknowledge this Guaranty as required on the signature page of this Guaranty.

**39.   COMMERCIAL TRANSACTION.  GUARANTOR ACKNOWLEDGES THAT THIS IS A "COMMERCIAL TRANSACTION" AS SUCH IS DEFINED IN CHAPTER 903a OF THE CONNECTICUT GENERAL STATUTES, AS AMENDED. GUARANTOR FURTHER ACKNOWLEDGES THAT, PURSUANT TO SUCH SECTION, GUARANTOR HAS A RIGHT TO NOTICE OF AND HEARING PRIOR TO THE ISSUANCE OF ANY "PREJUDGMENT REMEDY."  NOTWITHSTANDING THE FOREGOING, GUARANTOR HEREBY WAIVES ALL RIGHTS TO SUCH NOTICE, JUDICIAL HEARING OR PRIOR COURT ORDER IN CONNECTION WITH ANY SUIT ON THIS GUARANTY.**

**SIGNATURE PAGES TO FOLLOW**

**IN WITNESS WHEREOF**, Guarantor has duly executed this Guaranty as of the day and year first above written.

GUARANTOR

_____
ARON PURETZ, an individual

STATE OF NEW YORK    )
                         ) ss:
COUNTY OF KINGS    )

On the ___ day of August in the year 2021  before me, the undersigned, a Notary Public in and for said State, personally appeared **Aron Puretz** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

SANDRA KENIGSBERG
NOTARY PUBLIC-STATE OF NEW YORK
No. 01KE6018956
Qualified in Kings County
My Commission Expires February 01, 20 23

Guaranty of Payment

# EXHIBIT 3



107 Elm Street, 4 Stamford Plaza, 8th Floor
Stamford, CT 06902
Tel   +1 (203) 326-5800
cushmanwakefield.com

August 11, 2021

Joseph Bekar
Head of Underwriting
**IceCap Group - The Oved Group**
31 West 34th Street, Suite 1012
New York, NY 10001

Re:     Appraisal Report

      **South Green Portfolio**
      Hartford, Hartford County, CT 06114

      Cushman & Wakefield File ID:   21-14001-901190-001

Dear Mr. Bekar:

In fulfillment of our agreement as outlined in the Letter of Engagement copied in the Addenda, we are pleased to transmit our appraisal of the above referenced property in the following Appraisal Report.

The subject property consists of a portfolio of 18 multifamily buildings, containing  154 residential apartment units, in the South Green, Barry Square and South End neighborhoods of Hartford.  The majority of the properties range from 4-6 units, with the largest individual property in the portfolio consisting of 58 units at 29 Anawam Street.  The properties were constructed between 1890-1965, with a number of the buildings on Congress Street listed on the National Register of Historic Places.  Although the subject is owned and operated as one entity 128 of the 154 units are declared condos, which are recognized as individual tax parcels by the City of Hartford Assessor. The portfolio is currently 94.2 percent occupied at an average contract rent of $1,050 per unit per month. As of the inspection date, the portfolio was considered to be operating at a stabilized level.

In recent times, the CRE market has been driven by investor demand and strong liquidity. Asset values can fall significantly in short periods of time if either of these two factors, often in conjunction with many others, change significantly. While Cushman & Wakefield is closely monitoring the latest developments resulting from the COVID-19 pandemic,  and will continue to provide updates as events unfold, the reader is cautioned to consider that values and incomes are likely to change more rapidly and significantly than during standard market conditions. Furthermore, the reader should be cautioned and reminded that any conclusions presented in this appraisal report apply only as of the effective date indicated. The appraiser makes no representation as to the effect on the subject property of this event, or any event, subsequent to the effective date of the appraisal.

This Appraisal Report has been prepared in compliance with the Uniform Standards of Professional Appraisal Practice (USPAP). In addition, the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) specifies that a Federally regulated financial institution must be the Client in the appraiser-client relationship under the terms

Joseph Bekar
IceCap Group - The Oved Group
August 11, 2021
Page 4

Cushman & Wakefield of Connecticut, Inc.

of an assignment agreement. To the extent the Client is governed by FIRREA, this appraisal meets all applicable requirements.

Based on the agreed-to Scope of Work, and as outlined in the report, we developed the following opinion, inclusive of personal property:

| Value Conclusion | | | |
|---|---|---|---|
| Appraisal Premise | Real Property Interest | Date of Value | Value Conclusion |
| Market Value As-Is | Leased Fee Subject to Condominium Ownership (128 of 154 Units) | June 18, 2021 | $12,600,000 |

Compiled by Cushman & Wakefield of Connecticut, Inc.

## Extraordinary Assumptions

For a definition of Extraordinary Assumptions please see the Glossary of Terms & Definitions. The use of extraordinary assumptions, if any, might have affected the assignment results.

The subject property consists of a portfolio of apartment complexes located in various neighborhoods south of Downton Hartford.   The properties have historically operated as a portfolio managed under one entity.   At the request of our client we have valued the properties together as a portfolio, assuming investor would consider them as one asset.

## Hypothetical Conditions

For a definition of Hypothetical Conditions please see the Glossary of Terms & Definitions. The use of hypothetical conditions, if any, might have affected the assignment results.

This appraisal does not employ any hypothetical conditions.

This letter is invalid as an opinion of value if detached from the report, which contains the text, exhibits, and Addenda.

Respectfully submitted,

**CUSHMAN & WAKEFIELD OF CONNECTICUT, INC.**

Brian T. Royce, MAI, MRICS
Executive Director
CT Certified General Appraiser
License No. RCG.0001132
brian.royce@cushwake.com
(203) 326-5832 Office Direct

Gregory S Messina Jr.
Associate Director
CT Provisional Real Estate Appraiser
License No. RSP.0002013
Greg.Messina@cushwake.com
203-326-5855 Office Direct

# EXHIBIT 4

## FORBEARANCE AGREEMENT

**THIS FORBEARANCE AGREEMENT** (this "**Agreement**") made this 28th day of February 2023 (the "**Effective Date**") by and among:

**JM TIC LLC**, a New Jersey limited liability company, as to an undivided 8.00% tenant-in-common interest, with an address at 122 High Street, Passaic, New Jersey 07055 (hereinafter, "**JM Borrower**");

**RITZ GRANDE CT LLC**, a Connecticut limited liability company, as to an undivided 92.00% tenant-in-common interest, with an address at 139 Ocean Avenue, Lakewood, New Jersey 08701 (hereinafter, "**Ritz Borrower**", and together with the JM Borrower, individually and/or collectively, jointly and severally, the "**Borrower**");

**ICECAP REAL ESTATE LOAN FUND I LLC**, having an address at 31 West 34th Street, Suite 1012, New York, New York 10001 (hereinafter, together with its successors and assigns, "**Lender**"); and

**ARON PURETZ**, an individual with an address at 122 High Street, Passaic, New Jersey 07055 (hereinafter, "**Individual Guarantor**", and together with each of Borrower, individually and/or collectively, jointly and severally, the "**Guarantor**").

## RECITALS:

**WHEREAS**, on or about August 2, 2021, ICE LENDER HOLDINGS LLC, a New York limited liability company ("**Original Lender**") originated a mortgage loan to Borrower in the original consolidated principal amount of Nine Million Eight Hundred Forty Thousand and 00/100 Dollars ($9,840,000.00) (the "**Loan**");

**WHEREAS,** the Loan is evidenced by that certain Secured Note dated as of August 2, 2021, given by Borrower to Original Lender (the "**Note**");

**WHEREAS**, the Loan is further evidenced by, among other things, that certain Loan and Security Agreement dated as of August 2, 2021, between Original Lender and Borrower (the "**Loan Agreement**");

**WHEREAS**, the Loan is secured by, among other things, (i) that certain Open End Mortgage, Assignment of Rents and Fixture Filing dated as of August 2, 2021 given by Borrower in favor of Original Lender (the "**Mortgage**"), which Mortgage encumbers the Mortgaged Property (as such term is defined in the Mortgage), which Mortgaged Property is more particularly described on <u>Schedule A</u> attached hereto, (ii) that certain Ownership Interest Pledge Agreement dated as of August 2, 2021 by and between Jill Bogard Mirilis, an individual ("**Pledgor**"), as pledgor, and Original Lender, as pledgee (the "**Pledge Agreement**"), (iii) that certain (a) Guaranty

dated as of August 2, 2021, given by Individual Guarantor in favor of Original Lender, (b) that certain Guaranty dated as of August 2, 2021, given by JM Borrower, in its capacity as "Guarantor", in favor of Original Lender, and (c) that certain Guaranty dated as of August 2, 2021, given by Ritz Borrower, in its capacity as "Guarantor", in favor of Original Lender,  (collectively, the "**Guaranty**"), pursuant to which Guarantor guaranteed to Original Lender each payment of principal and interest due under the Note and all other obligations of Borrower under the Loan Documents and (iv) that certain Environmental Indemnity Agreement dated as of August 2, 2021, given by Borrower and Guarantor in favor of Original Lender (the "**Environmental Indemnity**", and together with the Note, the Loan Agreement, the Mortgage, the Pledge Agreement, the Guaranty and all other documents executed in connection with the Loan, the "**Loan Documents**"); and

     **WHEREAS**, on or about August 10, 2021, Original Lender assigned to Lender, and Lender assumed and purchased from Original Lender, all of Original Lender's right, title and interest in and to the Loan and the Loan Documents.

## DEFAULT

     **WHEREAS,** (i) pursuant to Section 2.1 of the Note, Borrower was required to make payments of interest on the first (1st) day of each month and (ii) pursuant to Section 2.1 of the Note, Borrower was required to repay to Lender on September 1, 2022 the unpaid principal balance of the Loan, as well as any and all accrued interest thereon and all other amounts due to Lender under the Loan Documents (collectively, the "**Indebtedness**");

     **WHEREAS**, pursuant to that certain Note and Mortgage Extension Agreement between Original Lender and Borrower dated September 15, 2022 (the "**First Extension Agreement**"), among other things, the Maturity Date of the Loan was extended from September 1, 2022 to December 1, 2022 (as extended, the "**First Extended Maturity Date**");

     **WHEREAS**, pursuant to that certain Note and Mortgage Extension Agreement between Lender and Borrower dated December 29, 2022 (the "**Second Extension Agreement**", and together with the First Extension Agreement, individually and/or collectively, the "**Extension Agreement**"), among other things, the Maturity Date of the Loan was further extended from December 1, 2022 to January 1, 2023 (as extended, the "**Second Extended Maturity Date**");

     **WHEREAS**, (a) (i) on July 1, 2022, Borrower failed to pay the property taxes that came due on the Property, and (ii) on January 1, 2023, Borrower failed to pay the property taxes that came due on the Property, and (b) on December 8, 2022, Lender notified Borrower in writing that the Borrower defaulted under the terms of the Loan Documents and the Extension Agreement by failing to (i) pay to Lender the Extension Fee (as such term is defined in the Second Extension Agreement) and (ii) repay the entirety of the Indebtedness (including the principal amount, plus all accrued interest and other fees and expenses) to Lender on the Second Extended Maturity Date (collectively, the "**Existing Default**");

4868-1085-8833, v. 3

**WHEREAS**, Borrower and Guarantor have each requested that Lender forbear in enforcing its rights under the Loan Documents, and Lender has agreed to do so pursuant to the terms of this Agreement; and

**WHEREAS**, conditioned on Borrower's and Guarantor's timely performance and full compliance with this Agreement, Lender is willing to agree to forbear from enforcing its rights under the Loan Documents with respect to the Existing Default until the earliest to occur of (i) a Termination Event (as hereinafter defined), (ii) **June 1, 2023** (the "**Third Extended Maturity Date**") and (iii) such sooner date, by acceleration or otherwise, as may be applicable pursuant to the terms of the Loan Documents, as modified herein, at which time the entire Indebtedness shall become due and payable, TIME BEING OF THE ESSENCE (the earliest of (i), (ii) and (iii), the "**Termination Date**") (the period from the Effective Date of this Agreement to the Termination Date, the "**Forbearance Period**"), on the terms, covenants and conditions set forth herein below.

**NOW THEREFORE**, for the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed by and among Borrower, Guarantor and Lender, as follows:

1.      The parties to this Agreement acknowledge that the above referenced recitals are true and correct, and are hereby incorporated by reference into this Agreement.

2.      Borrower and Guarantor hereby acknowledge and agree that, in accordance with the terms and conditions of the Loan Documents, Borrower is liable to the Lender as follows:

(a)      As of the date hereof, the outstanding principal balance of the Loan is $9,840,000.00 and the per diem interest on the Loan is $6,286.67 calculated at the Default Rate; and

(b)      Subject to Section 6(ii) hereof, all interest accruing upon the principal balance of the Loan and the total Indebtedness, including interest on any protective advances, shall accrue from and after the date of the Existing Default, i.e., July 1, 2022 (the "**Existing Default Date**") at the default rate of interest set forth in the Loan Documents (the "**Default Rate**").

Hereinafter all amounts due as set forth in this Paragraph 2 above shall be referred to collectively as the "**Obligations**".

3.      Forbearance. In consideration of Borrower's and Guarantor's performance in accordance with the terms of this Agreement, provided that no Event of Default arises under the Loan Documents after the Effective Date and a Termination Event does not occur, Lender shall forbear from exercising its rights and remedies under the Loan Documents, until the Termination Date has occurred. Notwithstanding the foregoing, nothing contained in this Agreement shall constitute a waiver by Lender of any default or event of default, whether now existing or hereafter arising (including, without limitation, the Existing Default). This Agreement shall only constitute an agreement by Lender to forbear from enforcing its rights and remedies under the Loan Documents as a result of the Existing Default upon the terms and conditions set forth herein.

3

4.      Waiver of Claims and Release. Borrower and Guarantor hereby acknowledge and agree that they have no offsets, defenses, claims, or counterclaims against Lender, Lender's affiliates, members of Lender or any of its or their affiliates and agents, or such parties' officers, principals, directors, employees, attorneys, representatives, predecessors, successors, and assigns (collectively, the "**Lender Parties**") with respect to the Loan, the Loan Documents and the Obligations, including, without limitation, the Existing Default, or otherwise, and that if Borrower or Guarantor now have, or ever did have, any offsets, defenses, claims (including, without limitation, claims of economic duress), or counterclaims against the Lender Parties, whether known or unknown, at law or in equity, from the beginning of the world through this date and through the time of execution of this Agreement, all of them are hereby expressly **WAIVED**, and Borrower and Guarantor each hereby **RELEASE** the Lender Parties from any liability therefor.  It is understood and agreed that this Paragraph shall not be deemed or construed as an admission by Lender of liability of any nature whatsoever arising from or related to the subject of this Paragraph or otherwise.

5.      Indemnity.  Borrower and Guarantor hereby agree to defend, indemnify, and hold the Lender Parties harmless from and against any losses, damages, costs (including, without limitation, reasonable attorneys' fees, court costs, and costs of appeal), expenses, judgments, liens, decrees, fines, penalties, liabilities, claims, actions, suits, and causes of action (collectively, the "**Claims**") arising, directly or indirectly, from: (a) to the extent not inconsistent with the terms of this Agreement and after any breach by Borrower or Guarantor of any warranty or representation contained in this Agreement or in the documents executed and delivered by Borrower and the Guarantor pursuant to this Agreement (with this Agreement, sometimes collectively referred to as the "**Borrower Documents**"); (b) to the extent not inconsistent with the terms of this Agreement and after any breach, default, or violation by Borrower or Guarantor of any covenant, agreement, or provision of the Borrower Documents or the Loan Documents other than with respect to the failure to make payment under the Borrower Documents; and (c) any claims by or liabilities to third parties pertaining to injury to persons or damage to property at the Property.

6.      Forbearance Terms.  Provided that Borrower and Guarantor comply with the terms and conditions of this Agreement, and provided a Termination Event does not occur, the following provisions shall apply to the Loan and the Loan Documents during the Forbearance Period:

> (i)     _Indebtedness_:  As of February 28, 2023, the total amount of the Indebtedness secured by the Mortgage shall be deemed to be **$10,063,421.51** (the "**Indebtedness**"), consisting of the sum of (i) the existing outstanding principal balance of the Loan in the amount of $9,840,000.00 (the "**Principal**"), (ii) the accrued and unpaid interest due and owing on the Loan at the nominal rate of interest from December 1, 2022 through December 31, 2022, in the aggregate amount of $69,700.00 (the "**January Payable Interest**") (it being understood and agreed that Lender has, as a one-time accommodation to Borrower, agreed to waive interest that has accrued at the Default Rate (i.e. in excess of the nominal rate) in the aggregate amount of $118,900.00, for the period from December 1, 2022 through December 31, 2022, (iii) the accrued and unpaid interest due and owing under the Loan at the nominal rate of interest from January

4

1, 2023 through January 31, 2023, in the aggregate amount of $69,700.00 (the "**February Payable Interest**"; and together with the January Payable Interest, individually and/or collectively, the "**Payable Interest**") (it being understood and agreed that Lender has, as a one-time accommodation to Borrower agreed to waive interest that has accrued at the Default Rate (i.e., in excess of the nominal rate) in the aggregate amount of $118,900.00, (iv) Extension Fees of $128,876.00 (the "**Extension Fee**"), (v) intentionally omitted (vi) Late Fees in the amount of $9,635.00 (the "**Late Fee**") (vii) a tax payment advance in the amount of $623.51 to reimburse Lender for Lender's payment of delinquent property taxes for the Tax Parcel 249-561-418 (the "**Tax Advance**"), and (viii) Legal Fees in the amount of $14,587.00 to reimburse Lender for Lender's legal costs paid by Lender on the date hereof for the preparation of this Agreement (the "**Legal Fees**"; and together with the Deferred Interest, the Late Fee, the Extension Fee and the Tax Advance collectively, the "**Deferred Amounts**"). Notwithstanding the foregoing, it is understood and agreed that (1) Borrower has made a payment to Lender in the amount of $69,700.00 on January 9, 2023, which $69,700.00 payment shall be applied by Lender against the January Payable Interest and (2) Borrower has made a payment to Lender in the amount of $69,700.00 on February 21, 2023, which $69,700.00 payment shall be applied by Lender against the February Payable Interest.

(ii)     *Interest Rate*.  Subject to the last paragraph of Section 9 hereof, and provided that Borrower and Guarantor comply with the terms and conditions of this Agreement, and provided that a Termination Event does not occur, during the Forbearance Period interest shall be charged on the total outstanding Indebtedness, computed from the Effective Date of this Agreement to the Termination Date at a fixed rate of TEN AND 50/100 PERCENT (10.50%) per annum (the "**Forbearance Rate**"), provided, however, Borrower shall only be required to current pay on a monthly basis for the Forbearance Period interest at a fixed rate of EIGHT AND 50/100 PERCENT (8.50%) (the "**Current Pay Rate**"), subject in all cases to the potential imposition of the Default Rate.  The unpaid balance of the interest payable at the Forbearance Rate each month (the "**Deferred Pay Rate**") shall be deemed earned on each monthly payment date but payment shall be deferred and shall not be due and payable until the Termination Date. For the avoidance of doubt, other than the Deferred Amounts and Deferred Pay Rate which shall not be payable until the Termination Date, Borrower shall be required to make monthly payments of interest in full at the Forbearance Rate subject to the terms of this Section 6(ii) on the first day of each month during the remainder of the term of the Loan.

(iii)     *Deed in Lieu Documents*.  Simultaneously with the execution of this Agreement, and as a condition precedent to the forbearance granted to Borrower and Borrower in accordance with the terms of this Agreement, Borrower, Guarantor and Lender have entered into that certain Agreement Regarding DIL Documents (the "**DIL Agreement**"), which DIL

Agreement, among other things, (A) shall be deemed to be a "Loan Document" for purposes of this Agreement and the other Loan Documents, (B) requires that Borrower and Guarantor execute, deliver and deposit with Lender as of the date hereof the fully executed documents and instruments identified on <u>Exhibit A</u> to the DIL Agreement (collectively, the "**DIL Documents**"), which DIL Documents shall be held by Lender in escrow until the occurrence of the DIL Effective Date (as defined in the DIL Agreement), at which time Lender is automatically and unconditionally authorized to record, and otherwise treat as in full force and effect, the DIL Documents and (C) requires that Borrower and Guarantor cooperate with Lender in connection with the transfer of the Property upon the DIL Effective Date as set forth in the DIL Agreement. By execution hereof, Borrower and Guarantor (on behalf of themselves and their affiliates) agree not to assert a defense, seek judicial intervention or injunctive or other equitable relief or otherwise impede, interfere with, hinder or fail to cooperate with, Lender (including, without limitation, by failing to execute any documents reasonably requested by Lender) in connection with a transfer of the Property in accordance with, and pursuant to, the DIL Agreement and the DIL Documents.

(iv)    *Principal Payment*. Notwithstanding anything contained herein to the contrary, provided that (a) no Termination Event has occurred and (b) no Event of Default (as such term is defined in the Note) has occurred, Borrower shall have the right to extend the term of the Loan to **September 1, 2023** (the "**Fourth Extended Maturity Date**") upon the payment to Lender of the sum of ONE MILLION AND 00/100 DOLLARS ($1,000,000.00) (the "**Principal Paydown**") on the Third Extended Maturity Date. Upon the Principal Paydown in accordance with this Section 6(iv), the DIL Agreement shall be null and void, and the Indebtedness shall become due, if not accelerated prior due to an Event of Default, on the Fourth Extended Maturity Date.

(v)    *Intentionally Omitted*.

(vi)    *Delinquent Property Taxes*. As of the date of this Agreement, it is acknowledged and agreed that there are (a) $119,579.29 of delinquent Property taxes that were due on July 1, 2022 and have not been paid (together with all penalties and interest thereon, the "**July Delinquent Property Taxes**"), and (b) $148,580.33 of delinquent Property taxes that were due on January 1, 2023 or January 18, 2023, and have not been paid (together with all penalties and interest thereon, the "**January Delinquent Property Taxes**", and together with the July Delinquent Property Taxes, individually and/or collectively, the "**Delinquent Property Taxes**"). It is understood and agreed that while Borrower is still responsible for the payment of the Delinquent Property Taxes, Lender may, but shall not be obligated to, make protective advances under the Loan to pay the Delinquent Property Taxes in the event Borrower does not pay same from

6

its own funds.  Any such protective advance made by Lender shall accrue interest at the Default Rate from the date such protective advance is made, and the amount of such protective advance(s), together with the interest accruing thereon at the Default Rate, shall be added to the Indebtedness.

(vii)   *Payable Interest and Deferred Amounts*.  The Deferred Amounts have been earned by Lender as of the date hereof, but shall not be due and owing until the Termination Date.

(viii)  *No Liens*.  Borrower and Guarantor hereby represent and warrant to Lender that there are no additional liens or encumbrances on the Property other than those that existed as of the initial closing of the Loan.

(ix)    *Intentionally Omitted*.

(x)     *Notices*.  All notices or other written communications hereunder and/or under the Loan Documents shall be deemed to have been properly given (i) upon delivery, if delivered in person with receipt acknowledged by the recipient thereof, (ii) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Borrower:

JM TIC LLC
122 High Street
Passaic, New Jersey 07055
Attention:

Ritz Grande CT LLC
139 Ocean Avenue
Lakewood, New Jersey 08701
Attention:

With a copy to:

Potok Law, LLC
747 Farmington Ave, Suite 9
New Britain, CT 06053
Attention:  Ben Potok, Esq.

If to Lender:

ICECAP REAL ESTATE LOAN FUND I LLC
31 West 34th Street, 4th Floor
New York, New York
Attention:  Jack Oved

7

With copies to:

Kriss & Feuerstein LLP
360 Lexington Avenue
New York, New York 10016
Attention:  Jerold C. Feuerstein, Esq.

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications; provided, however that Lender's failure to notice any Person other than Borrower shall not render ineffective or otherwise derogate from the validity of any notices properly issued to Borrower.  Borrower shall not refuse or reject delivery of any notice given in accordance with this Agreement, and shall acknowledge, in writing, the receipt of any notice upon request of Lender. Notices may be sent by a party's counsel.

(xi)  Provided a Termination Event does not occur, the Borrower shall have until the Termination Date, TIME BEING OF THE ESSENCE, to pay off the Loan and the entire Indebtedness (the "**Payoff**").

7.  Representations, Warranties and Covenants. Borrower and Guarantor:

(a)  Each hereby ratifies, confirms, and reaffirms all and singular the terms and conditions of the Loan Documents. Borrower and Guarantor each further acknowledge and agree that except as specifically modified in this Agreement or by the DIL Agreement and the DIL Documents, all terms and conditions of those documents, instruments, and agreements that compose the Loan Documents shall remain in full force and effect;

(b)  Each hereby ratifies, confirms, and reaffirms that (i) the obligations secured by the Loan Documents including, without limitation, the Obligations, and any future modifications, amendments, substitutions or renewals thereof, and (ii) all collateral, whether now existing or hereafter acquired, granted to the Lender pursuant to the Loan Documents (including, without limitation, pursuant to this Agreement and/or the DIL Agreement) or otherwise, shall secure all of the Obligations until full and final payment of the Obligations;

(c)  Each hereby confirms and agrees that a novation is expressly denied and not intended to be effected, and except as amended or modified by this Agreement and the DIL Agreement, the terms, provisions, conditions, rights, duties and obligations contained in the Loan Documents shall remain unchanged and unimpaired by this Agreement and are in full force and effect;

(d)  Each shall, from and after the execution of this Agreement, execute and deliver to the Lender whatever additional documents, instruments, and agreements that the Lender may require in order to vest or perfect the Loan Documents (including, without limitation, this Agreement and the DIL Agreement) and the collateral granted therein more securely in the Lender and to otherwise give effect to the terms and conditions of this Agreement and the DIL Agreement;

8

4868-1085-8833, v. 3

(e)      Each confirms that they have the capacity, right, power and authority to execute this Agreement, the DIL Agreement and the DIL Documents and to perform their respective obligations hereunder and thereunder. Neither Borrower nor Guarantor has filed a petition in any case, action, or proceeding under the United States Bankruptcy Code or any similar state law; no petition in any case, action, or proceeding under the United States Bankruptcy Code or any similar state law has been filed against Borrower or Guarantor that has not been dismissed or vacated; and neither Borrower nor Guarantor has filed an answer or otherwise admitted in writing insolvency or inability to pay their debts in general or made an assignment for the benefit of creditors or consented to an appointment of a receiver or trustee of all or a material part of their property. To Borrower's and Guarantor's knowledge, the transaction contemplated herein is not a preference, voidable transfer, fraudulent conveyance, or otherwise in violation of the United States Bankruptcy Code or any other similar state or federal law.

8.      <u>Conditions Precedent</u>. Lender's agreement to forbear as contemplated herein shall not be effective unless and until each of the following conditions precedent has been fulfilled:

(a)      Payment by Borrower of the entirety of the Payable Interest (i.e. $139,400.00, to be applied by Lender as set forth in Section 6(i) hereof.

(b)      Execution and delivery to Lender of the DIL Agreement and the DIL Documents;

(c)      Payment to Lender's counsel of the Legal Fees (to be reimbursed to Lender by Borrower in accordance with Section 6(i) hereof);

(d)      Borrower and Guarantor have the authority to execute any and all documents in connection herewith and in connection with the DIL Agreement and DIL Documents, and thus the execution, delivery and performance by Borrower and Guarantor of this Agreement, the DIL Agreement and the DIL Documents are binding;

(e)      This Agreement, the DIL Agreement, and all documents, instruments, and agreements required in connection with, or related to, this Agreement and the DIL Agreement (including, without limitation, the DIL Documents), shall be executed and delivered to Lender by the parties thereto, shall be in full force and effect; and

(f)      Borrower shall have delivered to Lender a legal opinion reasonably satisfactory to Lender and Lender's counsel concerning the authority, execution and delivery of this Agreement, the DIL Agreement and the DIL Documents by Borrower and Guarantor, and containing such other opinions customarily required by Lender and its counsel.

9.      <u>Termination Event</u>.  The occurrence of any one or more of the following events shall constitute an event of default (hereinafter, a "**Termination Event**") under this Agreement:

(a)      Subject to Section 6(vii) hereof, the failure of any of the Borrower or the Guarantors to pay any monthly payment required to be paid to Lender under this Agreement and the Loan Documents as and when due, TIME BEING OF THE ESSENCE; *<u>provided</u>*, however, it is

9

understood and agreed that a late charge and interest at the Default Rate will be charged upon any such missed payment immediately upon the expiration of any applicable grace period provided for under this Agreement or the other Loan Documents with respect to such missed payment.

(b)     Any failure to comply with the terms and conditions of this Agreement and/or the DIL Agreement, including, but not limited to, the conditions and requirements set forth in Section 6 of this Agreement (and/or a breach of the representation set forth in Section 6(viii) hereof, in the event such lien or encumbrance on the Property shall have a material adverse effect on Borrower, Guarantor, the Loan, the Property and/or Lender's security interest therein);

(c)     The Loan is not repaid in full on or prior to the Termination Date;

(d)     Any Event of Default under the Loan Documents, other than (i) the Existing Default and (ii) the non-payment of Property Taxes subject to Section 6(vi) of this Agreement; and

(e)     The imposition a tax lien against the Property in connection with the Delinquent Property Taxes ("**Tax Lien**") which is not satisfied or bonded to the satisfaction of Lender, in its sole discretion, within thirty (30) days of the filing of such Tax Lien.

Notwithstanding anything to the contrary set forth in this Agreement, upon the occurrence of the Termination Date, interest shall automatically be charged at the Default Rate, retroactive to the Existing Default Date in accordance with Section 2(b) hereof.

10.     <u>Rights Upon Occurrence of the Termination Date</u>.   Upon the occurrence of the Termination Date, (a) the Forbearance Period shall be terminated; (b) Lender shall have no further obligations to forbear or reinstate under this Agreement; (c) following any applicable notice and grace period set forth in the Loan Documents (if any), from and after the Termination Date, Lender may commence enforcing its rights and remedies under this Agreement and pursuant to the Loan Documents, including, without limitation, under the DIL Agreement; (d) interest for the Loan shall continue to accrue and be charged on the outstanding principal balances of the Obligations at the Default Rate effective as of Existing Default Date in accordance with Section 2(b) hereof, (e) Lender shall not waive the Default Rate interest accruing from the Existing Default Date, (f) the Forbearance Rate shall not apply, and (g) Borrower shall be obligated to pay the Loan and the Indebtedness in accordance with the Obligations set forth in Paragraph 2 herein, and any obligations for Lender to accept interest at the Forbearance Rate set forth in Paragraph 6(ii) shall be deemed null and void.

11.     <u>Costs of Collection</u>.  Upon the occurrence of the Termination Date, Borrower and Guarantor shall reimburse Lender within ten (10) days of written demand for any and all unreimbursed costs, expenses, and costs of collection (including attorneys' fees and expenses) heretofore or hereafter incurred by the in connection with the protection, preservation, and enforcement by Lender of its rights and remedies under the Loan Documents, this Agreement, the DIL Agreement and/or the DIL Documents, including, without limitation, the negotiation and preparation of this Agreement and such fees and costs shall become part of the Obligations until reimbursed.

10

12.   <u>Non-Interference</u>.   From and after the occurrence of the Termination Date, Borrower and Guarantor agree not to interfere with the exercise by the Lender of any of its rights and remedies, including, without limitation, pursuant to the DIL Agreement and the DIL Documents. Borrower and Guarantor further agree that they shall not seek to distrain Lender's efforts or otherwise hinder, delay, or impair the Lender's efforts to realize upon any collateral granted to the Lender, or otherwise to enforce its rights and remedies pursuant to the Loan Documents (including, without limitation, the DIL Agreement and the DIL Documents) except as otherwise set forth in this Agreement and/or the DIL Agreement. The provisions of this Paragraph shall be specifically enforceable by Lender.

13.   <u>Jury Trial</u>.   Borrower and Guarantor hereby make the following waiver knowingly, voluntarily, and intentionally, and understand that Lender, in entering into this Agreement or making any financial accommodations to Borrower or Guarantor, whether now or in the future, is relying on such a waiver: BORROWER AND GUARANTOR HEREBY IRREVOCABLY WAIVE ANY PRESENT OR FUTURE RIGHT TO A JURY IN ANY TRIAL OF ANY CASE OR CONTROVERSY IN WHICH THE LENDER BECOMES A PARTY (WHETHER SUCH CASE OR CONTROVERSY IS INITIATED BY OR AGAINST LENDER OR IN WHICH LENDER IS JOINED AS A PARTY LITIGANT), WHICH CASE OR CONTROVERSY ARISES OUT OF, OR IS IN RESPECT OF, ANY RELATIONSHIP BETWEEN BORROWER, GUARANTOR, OR ANY OTHER PERSON, AND LENDER.

14.   <u>No Reinstatement</u>.   It is expressly understood that, other than as set forth herein, Lender's execution of this Agreement and acceptance of payments in accordance herewith shall by no means be considered or construed a reinstatement or de-acceleration of the notes set forth in the Loan Documents, an extension of the Loan, or a waiver of Lender's rights or remedies at law, in equity or under the Loan Documents.

15.   <u>Entire Agreement</u>.   This Agreement shall be binding upon Lender, Guarantor, Borrower and their respective employees, representatives, successors, and assigns, and shall inure to the benefit of the Lender Parties. This Agreement and all documents, instruments, and agreements executed in connection herewith incorporate all of the discussions and negotiations between Borrower, Guarantor and Lender, either expressed or implied, concerning the matters included herein and in such other documents, instruments and agreements, any statute, custom, or usage to the contrary notwithstanding. No such discussions or negotiations shall limit, modify, or otherwise affect the provisions hereof. No modification, amendment, or waiver of any provision of this Agreement, or any provision of any other document, instrument, or agreement between Borrower, Guarantor and Lender, shall be effective unless executed in writing by the party to be charged with such modification, amendment, or waiver, and if such party be Lender, then by a duly authorized officer thereof.

16.   <u>Construction of Agreement</u>.   In connection with the interpretation of this Agreement and all other documents, instruments, and agreements incidental hereto:

11

(a)     All rights and obligations hereunder and thereunder, including matters of construction, validity, and performance, shall be governed by and construed in accordance with the law of the State of New York, without regard to conflicts of law.

(b)     The captions of this Agreement are for convenience purposes only and shall not be used in construing the intent of Lender, Guarantor and Borrower under this Agreement.

(c)     In the event of any inconsistency between the provisions of this Agreement and any other document, instrument, or agreement entered into by and between Lender (or Original Lender), Guarantor and Borrower, the provisions of this Agreement shall govern and control.

(d)     Lender, Guarantor and Borrower have prepared this Agreement and all documents, instruments, and agreements incidental hereto with the aid and assistance of their respective counsel. Accordingly, all of them shall be deemed to have been drafted by Lender, Guarantor and Borrower and shall not be construed against either Lender, Guarantor or Borrower.

17.     <u>Illegality or Unenforceability</u>.  Any determination that any provision or application of this Agreement is invalid, illegal, or unenforceable in any respect, or in any instance, shall not affect the validity, legality, or enforceability of any such provision in any other instance, or the validity, legality, or enforceability of any other provision of this Agreement.

18.     <u>Informed Execution</u>.  Each party to this Agreement warrants and represents to Lender that Borrower and Guarantor:

(a) Have read and understand all of the terms and conditions of this Agreement, the DIL Agreement and the DIL Documents;

(b) Intend to be bound by the terms and conditions of this Agreement and the DIL Agreement;

and

(c) Are executing this Agreement freely and voluntarily, without duress, after consultation with independent counsel of their own selection.

19.     <u>Recitals</u>.  All recitals contained in this Agreement are ratified and confirmed.  All defined terms set forth in the Loan Documents are adopted herein, and all terms used but not defined herein shall have the meanings afforded thereto in the Loan Documents.

20.     <u>Reservation of Rights</u>. By agreeing to forbear from the exercise of those rights and remedies granted to Lender under the Loan Documents until expiration or earlier termination of the Forbearance Period, Lender does not waive any of its rights or remedies with respect to the Existing Default. All rights and remedies of Lender with respect to the Existing Default are hereby preserved pending fulfillment of the Borrower's obligations under this Agreement and under the Loan Documents. The granting of the forbearance hereunder shall not, other than as expressly provided herein, be deemed a waiver of Lender's rights and remedies or constitute a course of conduct or dealing on behalf of Lender.  As set forth herein, upon the occurrence of the Termination Date, Lender shall have the right to exercise one or more of its rights and remedies

hereunder or pursuant to the DIL Agreement or other Loan Documents including, without limitation: (a) commencement of judicial foreclosure; (b) enforcement of its rights in and to all other collateral securing the Loan, in whole or in part, including the sale thereof or other disposition as provided in the Loan Documents or applicable provisions of the Uniform Commercial Code in effect in the State of New York; (c) commencement of proceedings to enforce the Note and the Guaranty and Environmental Indemnity; and (d) all other remedies available to Lender hereunder, pursuant to the DIL Agreement, the other Loan Documents or at law or in equity. Lender's agreements contained herein are limited to the express terms of this Agreement, and except as expressly set forth herein, shall not impair any right or remedy of Lender, or any of Borrower's or Guarantor's obligations to Lender, as applicable, or Lender's right to enforce full and strict performance of all of the terms of the Loan Documents (including, without limitation, the DIL Agreement) upon the occurrence of the Termination Date.

21.     <u>Guarantor.</u>   By his execution of this Agreement, Guarantor has evidenced his consent to the execution and delivery of this Agreement, the DIL Agreement and the DIL Documents by Borrower and his agreement to be bound by the terms hereof and thereof to the extent applicable.   Further, Guarantor hereby: (a) ratifies and confirms the Guaranty and Environmental Indemnity and any other guaranties given by Guarantor for the benefit of Lender in connection with the Loan; (b) agrees that the Guaranty and Environmental Indemnity and any other guaranties given by Guarantor for the benefit of Lender in connection with the Loan and / or the Building Loan are and shall, subject to the provisions of this Agreement, remain in full force and effect and that the terms and provisions of the Guaranty and Environmental Indemnity and any other guaranties given by Guarantor for the benefit of Lender in connection with the Loan cover and pertain to the Loan, the Note, and the other Loan Documents, as applicable; and (c) acknowledge that there are no offsets or counterclaims of any nature whatsoever to his obligations and liabilities under the Guaranty and Environmental Indemnity and any other guaranties given by Guarantor for the benefit of Lender in connection with the Loan.  Guarantor further acknowledges that the execution, delivery and effectiveness of this Agreement, the DIL Agreement and the DIL Documents shall not operate as a waiver of any right, power or remedy of Lender under the Guaranty and Environmental Indemnity and any other guaranties given by Guarantor for the benefit of Lender in connection with the Loan, or any other document, instrument or agreement executed and/or delivered in connection therewith.

22.     <u>Counterparts and Electronic Copies Deemed Originals</u>. This Agreement may be executed in counterparts, or electronic transmission, and when taken together shall constitute one single agreement. Electronic copies of signatures shall have the same force and effect as an original.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]
[SIGNATURE PAGE TO FOLLOW]

13

**IN WITNESS WHEREOF**, this Agreement has been executed as of the date first set forth above.

**LENDER:**

**ICECAP REAL ESTATE LOAN FUND I LLC**

By: _____
Name: Jack Oved
Title: VP

STATE OF NEW YORK )
                    ) ss:
COUNTY OF  New York )

On the 23 day of February in the year 2023, before me, the undersigned, a Notary Public in and for said State, personally appeared, _____Jack Oved_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public
PASI V MANTYLA
NOTARY PUBLIC-STATE OF NEW YORK
No. 02MA6412765
Qualified in New York County
My Commission Expires 01-11-2026

**BORROWER:**

**JM TIC LLC,**
a New Jersey limited liability company

By: _____
Name:  Aron Puretz
Title:   Manager

**RITZ GRANDE CT LLC,**
a Connecticut limited liability company

By:      Ritz Grande CT LLC, a New Jersey limited
         liability company, its Managing Member

By: _____
Name:  Aron Puretz
Title:   Sole Member

**GUARANTOR:**

_____

**ARON PURETZ,** an individual

STATE OF   N′Y   )

                                   ) ss:

COUNTY OF   OCer   )

On the 24 day of Febnory 23, in the year 2023, before me, the undersigned, a Notary Public in and for said State, personally appeared Aron Puretz, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual make such appearance before the undersigned in the City of _____ Lkwd _____, State of _____ NT _____.

_____
Notary Public

SHOSHANA JOSEPH
MY COMMISSION EXPIRES
NOTARY PUBLIC
STATE OF NEW JERSEY
NOVEMBER 10, 2024

## SCHEDULE A

### Legal Description of Property

**PARCEL ONE (30-54 ALDEN STREET)**

Those certain 19 property units situated in the City of Hartford, County of Hartford and State of Connecticut known as Unit Nos. 30A-102, 30A-202, 32A-101, 32A-201, 40A-103, 40A-203, 40A-303, 42A-102, 42A-202, 42A-302, 44A-101, 44A-201, 44A-301, 52A-102, 52A-202, 52A-302, 54A-101, 54A-201 and 54A-301 located in Aria Alden Condominiums together with an undivided interest each for an aggregate of 100% in the Common Elements and Limited Common Elements. Said Units being more particularly described in the Declaration of Aria Alden Condominiums by Aria Congress LLC dated June 18, 2018 and recorded on June 28, 2018 in Volume 7356 at Page 1 of the Hartford Land Records (the "Declaration"), as amended by documents recorded in Volume 7573 at Page 265 and at Page 268 of the Hartford Land Records, and as may be further amended.

Together with all development rights, declarant rights and special declarant rights relative to said Units.

**PARCEL TWO (38-60 CONGRESS STREET & 22-30 MORRIS STREET)**

Those certain 46 property units situated in the City of Hartford, County of Hartford and State of Connecticut known as Unit Nos. 22M-102, 22M-202, 22M-302, 24M-101, 24M-201, 24M-301, 30M-101, 30M-102, 30M-201, 30M-202, 30M-301, 30M-302, 38C-101, 38C-102, 38C-201, 38C-202, 38C-301, 38C-302, 42C-101, 42C-201, 42C-301, 44C-102, 44C-202, 44C-302, 46C-101,46C-201, 46C-301, 48C-102, 48C-202, 48C-302, 50C-201, 50C-202, 50C-301, 50C-302, 52C-102, 54C-101, 56C-201, 56C-202, 56C-301, 56C-302, 58C-101, 58C-201, 58C-301, 60C-102, 60C-202 and 60C-302 located in Aria Congress Condominiums together with an undivided interest each for an aggregate of 100% in the Common Elements and Limited Common Elements, said Units being more particularly described in the Declaration of Aria Congress Condominiums by Aria Congress LLC dated June 18, 2018 and recorded on June 28, 2018 in Volume 7356 at Page 82 of the Hartford Land Records.

Together with all development rights, declarant rights and special declarant rights held by Aria Congress LLC.

**PARCEL THREE (405-407 WETHERSFIELD AVENUE)**

A certain piece or parcel of land, together with the buildings thereon, situated in the Town and County of Hartford and State of Connecticut, being known as Nos. 405-407 Wethersfield Avenue, and being bounded and described as follows, to wit;

| | |
|---|---|
| NORTHERLY | by Bond Street, a distance of 150.28 feet; |
| EASTERLY | by Wethersfield Avenue, a distance of 65 feet; |
| SOUTHERLY | by land now or formerly of Ralph A. Sheheen et al, a distance of 150 feet; and |
| WESTERLY | by land now or formerly of Edmundo Platania et al, a distance of 55.80 feet. |

**PARCEL FOUR (409-411 WETHERSFIELD AVENUE)**

A certain piece or parcel of land, together with the buildings and improvements thereon, situated in the City of Hartford, County of Hartford and State of Connecticut, being known as No. 409-411 Wethersfield Avenue, and being more particularly bounded and described as follows:

| NORTHERLY: | By land now or formerly of Salvatore Carrabino, a distance of about 150 feet; |
| EASTERLY: | By Wethersfield Avenue, a distance of about 38 feet; |
| SOUTHERLY: | By land now or formerly of Samuel S. Schwartz, et al, a distance of about 150 feet; and |
| WESTERLY: | By land now or formerly of Frank M. Manacchio, a distance of about 38 feet, more or less. |

The northeast corner of said piece or parcel of land is about 65 feet south of the intersection of the westerly line of Wethersfield Avenue and the southerly line of Bond Street.

Said premises are conveyed together with a 12-foot wide right of way for ingress and egress, by foot and vehicle across the parking lot of 405-407 Wethersfield Avenue to Bond Street for the benefit of this parcel.

**PARCEL FIVE (415 WETHERSFIELD AVENUE – UNITS 1, 2, 3, 4 and 5)**

Those certain Units, with the appurtenances thereto, located in the City of Hartford, County of Hartford and State of Connecticut known as Unit Nos. 1, 2, 3, 4 and 5 of Barker House Condominium, together with its interest in the Common Elements appurtenant thereto, said Units and Common Elements being more specifically designated and described in the Declaration entitled, "Declaration of Barker House Condominium" by Ralph A. Sheheen and Ellen F. Sheheen, dated December 23, 1982, and recorded in Volume 2026 at Page 44 of the Hartford Land Records, and the survey and floor plans of Barker House Condominium filed in the Hartford Land Records simultaneously therewith.

**PARCEL SIX (468-470 WETHERSFIELD AVENUE)**

A certain piece or parcel of land, with the buildings and improvements thereon, situated in the Town of Hartford, County of Hartford and State of Connecticut, on the east side of Wethersfield Avenue, known as Nos. 468-470 Wethersfield Avenue, and more particularly bounded and described as follows:

| NORTH: | by lands now or formerly of Calvin Meyer, Edward J. Poulin and Helen E. Poulin, partly by each; |
| EAST: | by lands now or formerly of John Novosel and Frank Evanusch, partly by each; |
| SOUTH: | by land now or formerly of Maria Paskov; and |
| WEST: | by Wethersfield Avenue. |

Being about Seventy-Four (74) feet front and rear and about Two Hundred (200) feet deep.

**PARCEL SEVEN (474 WETHERSFIELD AVENUE)**

A certain piece or parcel of land together with all buildings thereon, situated in the Town of Hartford, County of Hartford and State of Connecticut, known as No. 474 Wethersfield Avenue and more particularly bounded and described as follows, to wit:

| NORTHERLY: | by land now or formerly of Dominick Stavola and Domenico Ronzo, Two Hundred (200) feet; |
| EASTERLY: | by land now or formerly of Frank Evanusch, Thirty-Three (33) feet; |
| SOUTHERLY: | by land now or formerly of The Second Church of Christ in Hartford, Two Hundred (200) feet; and |
| WESTERLY: | by Wethersfield Avenue, Thirty-Three (33) feet. |

The south line of said premises runs through the center or a partition wall of the double dwelling house, the north half of which stands on the premises herein described.

The east line of said premises is a straight line running from a point in the north boundary line of premises of the Second Church of Christ of Hartford, which point is Two Hundred (200) feet from the east street line of Wethersfield Avenue, to the southeast corner of premises now or formerly of Dominick Stavola and Domenico Ronzo.

**PARCEL EIGHT (476 WETHERSFIELD AVENUE)**

A certain piece or parcel of land, with the building and improvements thereon, situated in the Town of Hartford, County of Hartford and State of Connecticut known as 476 Wethersfield Avenue and being more particularly bounded and described as follows:

| | |
|---|---|
| NORTHERLY: | by land now or formerly of Maria Paskov and Stephen F. Ivanusic, partly by each, in all, Two Hundred Fifty (250) feet; |
| EASTERLY: | by land now or formerly of American Linen Supply Company, Thirty-Three (33) feet; |
| SOUTHERLY: | by land now or formerly of Minerva A.W. Smith, about Two Hundred Fifty (250) feet; and |
| WESTERLY: | by Wethersfield Avenue, Thirty-Three (33) feet. |

**PARCEL NINE (29-31 ANNAWAN STREET)**

Those certain 58 property units situated in the City of Hartford, County of Hartford and State of Connecticut known as Unit Nos. A2, A4, A6, B1, B2, B3, B4, B5, B6, C1, C2, C3, C4, C5, C6, D1, D2, D3, D4, D5, D6, E1, E2, E3, E4, E5, E6, F1, F2, F3, F4, F5, F6, F7, G1, G2, G3, G4, G5, G6, H1, H2, H3, H4, H5, H6, I1,I2, I3, I4, I5, I6, J1, J2, J3, J4, J5 and J6 located in Aria Annawan Condominiums together with an undivided interest each for an aggregate of 100% in the Common Elements and Limited Common Elements. Said Units being more particularly described in the Declaration of Aria Annawan Condominiums by 29 Annawan Street LLC dated June 18, 2018 and recorded on June 28, 2018 in Volume 7355 at Page 201 of the Hartford Land Records (the "Declaration").